[Nos. 34671-7-I; 34672-5-I; Division One.    May 6, 1996.]
34673-3-I.

THE STATE OF WASHINGTON, *Respondent*, v. RICHARD
WILLIAM CASEY, SR., ET AL., *Appellants*.

*John Henry Browne* and *Browne & Ressler,* for appellants.

*Norm Maleng, Prosecuting Attorney,* and *Scott A. Peterson, Deputy,* for respondent.

BAKER, C.J. — Richard Casey, Sr., Billy Joe Casey, and Richard Casey, Jr. (hereafter Casey) appeal their convictions for theft by deception, money laundering, and leading organized crime. They argue that (1) the trial court erroneously refused to instruct the jury on a defense of good faith claim of title, (2) five convictions for theft by deception were not supported by evidence of reliance, (3) insufficient evidence supported the convictions for money laundering and leading organized crime, and (4) cumulative error denied them a fair trial. We affirm, holding that the good faith claim of title defense is inapplicable to theft by deception and that the convictions were supported by sufficient evidence.

## FACTS

Casey made a practice of buying asphalt and driving to private residences to ask if the owner, usually an elderly person, would like paving done. In the cases for which Casey was convicted, he offered to pave at cost, at an undisclosed reduced rate, or at a low quoted rate. Casey often

represented that he had "a little" leftover asphalt to use from another job. In at least two cases he also represented that Casey Asphalt Paving was a local business based in Snohomish. While Casey had a Washington business license and a yellow pages ad, his business phone and address were actually an answering service in Snohomish. In each case Casey either paved much more than the victim expected, substantially increasing the final price, or charged a price well above the going rate, or both. After each job, Casey escorted the customer to the bank to get an instant cash payment, immediately went alone to the customer's bank to cash the customer's personal check, or had the customer purchase a cashier's check to pay Casey before he left. In each case, the asphalt began to crumble and sprout weeds within a few months. An expert testified that the defects resulted from Casey's substandard site preparation and workmanship. During their investigation, police discovered large amounts of cash in a safety deposit box and in the purse of one defendant's wife. Evidence showed that Casey made several cash payments on his trucks during this period.

## GOOD FAITH CLAIM OF TITLE

In refusing to instruct on the good faith claim of title defense, the trial court relied on *State v. Stanton*,[1] where we held that the defense is not available in a trial for theft by deception:

> Before the jury can convict on such a charge, it must find that the defendant obtained control over the property of another "by color or aid of deception". Such a finding necessarily includes an implied finding that the defendant did *not* obtain control over the property "openly and avowedly under a good faith claim of title".[2]

Likewise, our Supreme Court has held the good faith claim

---

[1] 68 Wn. App. 855, 845 P.2d 1365 (1993), *review denied*, 126 Wn.2d 1016 (1995).

[2] (Citation omitted.) *Stanton*, 68 Wn. App. at 868.

of title defense inapplicable to a charge of obtaining money by false pretenses.[3]

Casey questions the soundness of these decisions and argues that the Legislature intended to make the defense available in any theft case where supported by substantial evidence. He refers to RCW 9A.56.020(2), which provides that " [i]n any prosecution for theft, it shall be a sufficient defense that the property or service was appropriated openly and avowedly under a claim of title made in good faith, even though the claim be untenable." We do not agree that this statute requires instruction on a defense of a good faith claim of title in cases where, as here, it is logically impossible to convict without implicitly rejecting any claim of good faith. A jury cannot convict on a charge of theft by deception without first rejecting any claim of good faith by the defendant. We therefore reiterate the conclusion we reached in *Stanton*: The good faith claim of title is inapplicable as a matter of law where the charge is theft by deception.

Nor is our decision inconsistent with *State v. Ager*,[4] in which the Supreme Court approved an instruction on the good faith claim of title defense in a trial for theft by embezzlement. In the case of a theft by deception, a good faith claim of title would negate a specific element of the crime, namely deprivation " [b]y color or aid of deception".[5] In contrast, the good faith claim of title is an affirmative defense to theft by embezzlement, but does not negate any particular element of that charge. *Ager* is thus not controlling here.

## RELIANCE

■■ Casey urges reversal of five theft convictions for insufficient proof of the victims' reliance on his deceptions. Although the statutory definition of theft by decep-

---

[3]*State v. Mercy*, 55 Wn.2d 530, 533, 348 P.2d 978 (1960).

[4]128 Wn.2d 85, 91-97, 904 P.2d 715 (1995).

[5]RCW 9A.56.020(1)(b).

tion does not explicitly require reliance,[6] reliance was an essential element of its precursor, larceny by false pretenses.[7] The State posits that the Legislature removed the element of reliance when it enacted the new theft statute. We disagree, but hold that sufficient evidence of reliance was produced to affirm the convictions.

The evolution of the crime of larceny by false pretenses into theft by deception did not change its essential elements.[8] First, the terms "theft" and "larceny" are legally equivalent.[9] Second, the Legislature chose to preserve the operative language "by color or aid of". Finally, substitution of the term "deception" for "false pretenses" merely indicates an intent to broaden the scope of the statute to include more kinds of devious behavior. For example, a false or fraudulent representation was defined in part as an "untrue statement of an existing or past fact".[10] Untrue statements included nonverbal acts and conduct.[11] In contrast, deception appears to be a broader term designed to encompass not only representations about past or existing facts, but also representations about future facts,[12] inducement achieved by means other than conduct or words,[13] and inducement achieved by creating a false impression even though particular statements or acts might not be false.[14]

We now consider evidence of reliance in the challenged

---

[6]RCW 9A.56.010(2), (4); RCW 9A.56.020(1)(b).

[7]*E.g., State v. Eppens*, 30 Wn. App. 119, 127, 633 P.2d 92 (1981); former RCW 9.54.010(2).

[8]Our interpretation is consistent with dicta in *State v. Southard*, 49 Wn. App. 59, 62 n.2, 741 P.2d 78 (1987), where we noted that the elements of larceny did not change with recodification.

[9]RCW 9A.56.100.

[10]*State v. Renhard*, 71 Wn.2d 670, 672, 430 P.2d 557 (1967).

[11]*State v. Moore*, 189 Wash. 680, 685, 66 P.2d 836 (1937).

[12]*See* RCW 9A.56.010(4)(e).

[13]*See* RCW 9A.56.010(4)(b).

[14]*See State v. Wellington*, 34 Wn. App. 607, 610-11, 663 P.2d 496, *review denied*, 100 Wn.2d 1006 (1983).

transactions. When a conviction is attacked for lack of sufficient evidence supporting an essential element of the crime, we review to determine whether any rational trier of fact could have found the existence of the element beyond a reasonable doubt.[15] Reliance is established where the deception in some measure operated as inducement.[16] Therefore, the deception need not be the sole means of inducing the victim to part with his or her property.[17]

## WILLIAMS

Casey represented to Williams that he had "a little" asphalt left over from a nearby job and would lay it for her at half price. Kvalheim, the expert witness, testified that a reasonable average price for a paving job on a residential driveway is one dollar per foot for a large job, $1.25 for a medium job and $1.35 for a small job. Casey charged $1.39 per square foot and Williams paid $1.20 or a total of $2,755. Before Casey began, he asked Williams what part of the drive he should pave. Williams asked him to pave near the road and mailbox. Casey laid asphalt from the mailbox all the way to the house, which Williams testified she did not expect. She was "floored" when she got the original bill for approximately $3,300. This evidence supports the jury's determination that Williams agreed to buy the asphalt only because she expected to pay for a small amount of work.

## LESOURD

LeSourd agreed to have Casey fix some low spots approximately four or five feet wide in his otherwise good driveway. Instead, Casey paved the entire drive. While Casey and crew were working, LeSourd objected but Casey refused to stop, saying "this is what you need. You need

---

[15]*State v. Green*, 94 Wn.2d 216, 221-22, 616 P.2d 628 (1980).

[16]*State v. Zorich*, 72 Wn.2d 31, 34, 431 P.2d 584 (1967).

[17]*Zorich*, 72 Wn.2d at 34.

the whole thing." LeSourd again told Casey that he did not agree to pay for the full driveway. Casey continued, eventually using three truckloads of asphalt. Casey billed $1.60 or $1.61 per square foot and LeSourd paid him one dollar per square foot or a total of $3,786. A rational trier of fact could find beyond a reasonable doubt that LeSourd only hired Casey because he expected Casey to pave and charge for the low spots in the driveway.

## BYBEE

Bybee testified that Casey offered to roll leftover asphalt from a nearby job on his gravel drive. Bybee supposed that Casey would pave a small amount, but Casey used several truckloads and paved approximately three hundred linear feet of drive. Casey told Bybee he would provide the extra truckloads at a reduced price, and ultimately charged approximately $1.50 per square foot or $5,200. A rational trier of fact could find beyond a reasonable doubt that Bybee believed that he would buy only leftover asphalt and receive a discounted price. It does not matter that Bybee did not know the reasonable price; it is enough that he relied on Casey's representation that he would receive a discounted price.

## SPAHR

Spahr testified that Casey told him he would pave part of his long dirt and gravel drive with asphalt left over from another job, and only charge for the cost of the asphalt. Casey refused Spahr's request for an estimate but Spahr allowed him to proceed because he thought the small amount of asphalt would cost only a few hundred dollars. Casey used two full truckloads of asphalt, and charged $2.50 per square foot. Spahr paid $2.03, for a total of $3,250. This price was well above the expert witness's estimate of a fair price for both costs and labor combined. Any rational trier of fact could find beyond a reasonable doubt that Spahr relied on Casey's insinuations that only

a small amount of asphalt would be used and that he would save money because he would be charged only for the price of the asphalt.

## KOCHEVAR

Kochevar agreed with Casey to have her entire driveway paved at one dollar per square foot. Kochevar testified that her driveway is over 400 feet long, and that she paid $8,989. The expert witness testified that based on his measurements Casey charged well over one dollar per square foot. Kochevar was "shocked" by the amount but received a full refund after a neighbor complained on her behalf about the poor quality of the paving. In his reply brief, Casey concedes that the evidence supports reliance but argues that it does not support deception because the refund could also indicate that the initial quote was a mistake. We agree that the refund could lead to that conclusion; however, we disagree that a rational jury could not have concluded otherwise.

For each of the five counts, the victim's testimony supports the conclusion that he or she relied in whole or in part upon a deceptive representation by Casey when deciding to accept his offer. Because sufficient evidence supported these five convictions, we need not address Casey's argument that insufficient proof of theft invalidated the convictions for money laundering and leading organized crime.

## MONEY LAUNDERING

■ Casey's money laundering convictions were based in part on the several payments made on his trucks. In order to convict Casey of laundering money, the jury had to find that he knowingly conducted a financial transaction involving the proceeds of theft by deception.[18] The State presented evidence that in each case Casey either took the

---

[18]*See* RCW 9A.83.020(1)(a). Although the recent Washington money laundering statute was modeled on the analogous federal provision, 18 U.S.C. § 1956, it

customer to his or her bank to immediately obtain cash payment, went directly to the bank himself to cash the check, or had the customer purchase a cashier's check before Casey left the property that day. During their investigation, the police discovered $79,000 cash in a safety deposit box and $10,736 cash in a purse belonging to one defendant's wife. Most of the truck payments were made with cash or with money orders, which are purchased with cash.

■ Casey argues that the State did not establish that all of the payments made on his trucks came from the thefts. Although no Washington case addresses the issue, persuasive federal cases hold that the prosecution need not trace all funds used to criminal activity. To require such proof would allow launderers to avoid prosecution by commingling funds.[19] The State's evidence supports a finding that the cash transactions involved at least some funds derived from theft, and we hold that such evidence is sufficient to support the conviction for money laundering.

Affirmed.

COLEMAN and AGID, JJ., concur.

Review denied at 130 Wn.2d 1009 (1996).

punishes a broader range of conduct because it does not require that the transaction be made with the intent to conceal the illegal source of the funds.

[19]*E.g., United States v. Cancelliere*, 69 F.3d 1116, 1120 (11th Cir. 1995).