
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 35112-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | OPINION PUBLISHED |
| KARRLEE THERESA CLEMENTS, | ) | IN PART |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Dicta in the Washington Supreme Court's 1931 decision in *Beglinger v. Shield* expressed then-prevailing common law that once a jury's verdict is accepted and the jury is discharged, "'[t]he power of a jury over their verdict . . . ceases . . . and they cannot be recalled to alter or amend it.'" 164 Wash. 147, 152, 2 P.2d 681 (quoting 27 RULING CASE LAW *Verdict* § 67, at 895 (1920)). Well-reasoned modern cases reject this bright line rule, recognizing that if a jury's discharge is rescinded within a short period of time and external influences have not compromised its impartiality, reempaneling a jury can be a more reasonable response to an error in a verdict than is the alternative of a new trial.

Karrlee Clements appeals her convictions and exceptional sentence for first degree theft and first degree identity theft, arguing in part that her conviction for identity theft

cannot stand where the jury, having completed a flawed verdict form, was momentarily

discharged before being recalled to complete a corrected verdict form. Following a

reference hearing and clarification of the timing and circumstances of the jury's brief

discharge, we conclude the conviction can stand.

For that reason, and because Karrlee[1] raises no other viable issues on appeal, we

affirm.

## FACTS AND PROCEDURAL BACKGROUND

Catherine Clements worked as a nuclear operator for 24 years at the Hanford

Nuclear Reservation. She retired in 2013, at age 55. She did not yet qualify for Social

Security, but her house was paid off and until she did qualify, she planned to live frugally

using assets in a 401(k) account that she held with The Vanguard Group.

A couple of years later, Catherine's daughter-in-law, Monique, expressed concern

about a conversation she had recently had with Catherine's daughter, Karrlee. Karrlee

told Monique that she had withdrawn some funds from her mother's 401(k) account.

Karrlee told Monique that withdrawals from the account were permitted for limited

purposes, one being home improvements. She said that friends would provide her with

inflated bids for improvement projects for her mother's home, she would withdraw the

funds, pay the actual cost for the home improvement, and pocket the difference.

---

[1] Given the common last name of most of the witnesses, we refer to them by their first names. No disrespect is intended.

2

Assisted by her brother-in-law, who always helped Catherine with computer transactions, Catherine discovered that the registered user address for her online account with Vanguard had been changed from her brother-in-law's e-mail address to an address belonging to Karrlee. Using Vanguard's security questions for Catherine, they were able to access account statements and discovered that substantial funds had been withdrawn. The next day, Catherine and her son, daughter-in-law, and brother-in-law went to the Kennewick Police Department to file a police report.

Investigation by Kennewick police revealed that Karrlee used a number of e-mail addresses to access her mother's 401(k) account online. Karrlee had also applied for an American Express credit card in her mother's name and then created subaccounts, obtaining six cards in variations on Karrlee's own name. Through transfers from the 401(k) account, to the American Express card in Catherine's name, to a subaccount in a variation on her own name, Karrlee had withdrawn over $200,000 from her mother's 401(k) account between May 2014 and August 2015. Catherine eventually realized that Karrlee had tricked her into providing the answer to Catherine's security question for online access to the Vanguard account. Claiming to be preparing a family tree, Karrlee asked Catherine for Catherine's mother's unusual and unusually-spelled maiden name. Catherine provided the information but no family tree was ever prepared.

Karrlee was charged with theft and identity theft with aggravating circumstances: that the crimes were major economic and domestic violence offenses. She defended on

3

the basis that the funds were withdrawn with her mother's permission, to be used for improvements to her mother's home. Karrlee lived with her mother, and Karrlee's boyfriend had moved into Catherine's home as well.

Catherine testified at trial that she knew Karrlee and her boyfriend had undertaken some improvement projects in her home. But Catherine testified that Karrlee continually said her boyfriend was paying for the improvements "[b]ecause he was gonna be livin' in the house." Report of Proceedings (RP) at 234.

At trial, the State offered photographs of projects Karrlee had undertaken on the house, many of which remained unfinished or had been finished poorly. It presented evidence that the home, which Catherine had since sold, sold for only $135,000.

The jury found Karrlee guilty on both counts, and found both aggravators. When the jury returned its verdicts and the clerk read them aloud, however, the first and second verdict forms indicated a finding of guilt of *theft* in the first degree, neither addressing *identity theft* in the first degree—an irregularity that went unnoticed. A special verdict form for the major economic offense aggravator was predicated on having found Karrlee guilty of identity theft, however. *See* Clerk's Papers (CP) at 152 ("We, the jury, having found the defendant guilty of Identity Theft in the First Degree return a special verdict by answering as follows . . . ."). The jury had been properly instructed on the different crimes charged in count I and count II and the prosecutor had discussed the different crimes in his closing argument. *E.g.*, RP at 322 ("She's guilty of theft in the first degree.

4

She's guilty of identity theft in the first degree. It is a major economic offense, and it was by a family or a household member. It's important to hold her accountable, and I'll ask you to do that by finding her guilty as charged.").

After polling the jury, the trial court told the jurors, "You are all now discharged as jurors and discharged from my instructions regarding independent research and speaking about the case. You are free to talk to anyone you wish, and you're also free to decline to talk to anyone." RP at 343. The court went on to say, "I always enjoy the opportunity to chat with jurors after a verdict," and invited them to stay if they wanted to meet after the court completed "a little bit of business here in the courtroom." *Id.* The court also stated, however, "If not, you're sure free to go as soon as you hit the door." *Id.* The jurors were then escorted from the courtroom.

The report of proceedings reflects what happened next:

(Whereupon the jurors were escorted from the courtroom.)

[DEFENSE COUNSEL]: Your Honor, I heard something from the clerk that sounded odd to me. It said Count II was theft in the first degree, and they found her guilty of theft in the first degree as Count II.
THE COURT: The verdict forms, may I have them?
THE CLERK: (Indicating.)
THE COURT: Count I is the theft and Count II is the identity theft.
[DEFENSE COUNSEL]: That's not how I heard it.
THE COURT: Oh my. Oh my. Will you run and stop any jurors from leaving the building, please?
THE CLERK: (Indicating.)
[PROSECUTOR]: What is it?

THE COURT:  They both say theft in the first degree.  Verdict Form One says theft in the first degree as charged in Count I.  Verdict Form Two says theft in the first degree as charged in Count II.

[To the lawyers:]  You may be seated, if you wish.

[DEFENSE COUNSEL]:  I've never had this issue come up, your Honor.

THE COURT:  I have.

[DEFENSE COUNSEL]:  Okay.

THE COURT:  Do we still have all of our jurors?

THE BAILIFF:  Uh-huh.

RP at 344-45.

The court then told counsel that it believed the proper course of action was to recall the jurors, explain that there was an error in one of the verdict forms, not identify what it was, give them the four blank verdict forms (with the second form corrected), and have them complete the forms a second time.  Neither party objected or requested any questioning of the jurors about what had transpired following their discharge.  The following then occurred:

(Whereupon the jurors were escorted into the courtroom.)

THE COURT: Ladies and gentlemen, I made an error.  Specifically, I made an error on one of the four verdict forms.  So, I must tell you a couple of things.  One, you are not discharged as jurors.  You're still jurors subject to all of the instructions of the Court.  Two, once we get the corrected verdict—once we get that verdict form corrected you will be given four new blank verdict forms, and my instructions to you will be to resume deliberations until you have reached your verdicts.

Notice I'm not telling you what the error was because I'm afraid that if I were to do so that could be interpreted as my giving you certain instructions as to what to do, okay?  So, Madam Bailiff will take you back to the jury room.  In the meantime, these instruction forms—blank

6

instruction forms will be prepared and you should have them within five or
ten minutes.

THE BAILIFF: Do I have to bring the evidence back?

THE COURT: Yes.

So, it's just as if you had not reached any verdict. You are to resume
your deliberations until you can reach verdicts.

And their notepads are still in the jury room?

THE BAILIFF: Nope. I will retrieve them.

THE COURT: Okay, good. All right, why don't you accompany
the bailiff back to the jury room.

(Whereupon the jurors were escorted from the courtroom.)

RP at 349-50.

Following a short period of additional deliberation,[2] the jurors returned the second

set of verdict forms, finding Karrlee guilty on both counts and again finding both

aggravating factors.

After oral argument of this appeal, the panel ordered a reference hearing to take

evidence and answer the panel's questions about events transpiring following the jury's

initial discharge. The superior court conducted a hearing in which it heard from the

deputy clerk and bailiff who were present for the trial, and from Karrlee's defense

lawyer.[3] Based on the testimony of the witnesses, all of whom the superior court found

---

[2] According to the clerk's minutes, the jury was escorted out of the courtroom at
2:43 p.m. Court was back in session with parties present to hear the second verdict by
3:08 p.m. The court had stated it would be "five or ten minutes" before the corrected
verdict forms would be provided. RP at 349. We do not know whether the parties had to
be located for the return of the second verdicts or had remained in the courtroom.

[3] Karlee was represented at the reference hearing by a different court appointed
lawyer. Findings of Fact Pursuant to Order for Reference Hr'g at 3.

7

credible and to have a good understanding of the events, the court found that the

following events happened at the following times:

| | |
|---|---|
| •2:26 p.m. | Court is in session for the announcement of the verdicts. |
| •Between 2:29 and 2:32 p.m. | Jurors were excused. |
| •Between 2:30 and 2:34 p.m. | Jurors were stopped and notified not to leave the building pursuant to the trial court's directive. |
| •Between 2:31 and 2:36 p.m. | Bailiff answers "Uh-huh" to the court's question, "Do we still have all of our jurors?" |

Findings of Fact Pursuant to Order for Reference Hr'g at 3.

The superior court found that between the time jurors were excused following the

taking of the first verdicts and the time they were stopped and notified not to leave the

building, they were being taken to the jury room or were in the hallway outside the jury

room. It found that the clerk told the bailiff not to release the jurors as the bailiff was

escorting them to the jury room, at which point the bailiff had the jurors line up in the

hallway in preparation for returning to the courtroom.

More important than the time of day, which is necessarily a range, the superior

court found that "at most between 1-2 minutes elapsed from the time the jurors were

excused and the Judge asked the clerk to stop the jurors."[4] *Id.* at 2. The court also found

that it was only another 1-2 minutes before the bailiff returned and indicated to the trial

---

[4] The court found that the trial was held in the courtroom closest to the jury rooms, partially explaining how the clerk and bailiff were able to stop the jurors so quickly. *Id.* at 1.

judge that "we still have all of our jurors." *Id.* at 3. The balance of the 16 minutes was consumed by the jury providing its verdicts, being polled, being excused, and waiting in the hallway to return.

The court made additional findings that the bailiff who served at the trial is strict about juror access to social media and has a practice of telling jurors to either leave their cell phones in their vehicles or use their phones only with her permission and with her monitoring the call. The court found no evidence that any jurors were in communication with anyone other than their fellow jurors and the bailiff before returning to the courtroom. It added that it is not positively known that there were no communications, however.

The court imposed an exceptional sentence of 20 months of total confinement. Karrlee appeals.

ANALYSIS

Karrlee makes two related assignments of error to the second set of verdicts: that they violated her right to trial by jury and, if not, then her trial lawyer provided ineffective assistance of counsel by bringing the problem with the verdict form to the court's attention in time to cure the error. She raises two alleged evidentiary errors, two

alleged instructional errors, and two alleged sentencing errors.[5]  We address her claims of

error in the foregoing order.

In the published portion of this opinion, we address only her assignment of error to

the second set of verdicts.

I.       ERRORS RELATED TO THE INITIAL DISCHARGE OF THE JURY

Karrlee contends that reassembling the jury after its discharge and allowing jurors

to return a second set of verdicts violated her constitutional right to a sentence authorized

by a jury's verdict.  But the harm she alleges is one associated with a different

constitutional concern: her right to an *impartial* jury.  We conclude that Karrlee's right to

a sentence authorized by a jury's verdict is not implicated in this case.  Her right to an

impartial jury is.

Dicta in *Beglinger*, 164 Wash. 147, suggests that a jury's discharge is a bright line

after which it cannot be reempaneled.  The dicta relies on common law, but also reasons

that jurors, once discharged, may be exposed to external influences.  Insofar as *Beglinger*

was based on common law, we find the 87-year-old common law to be outdated.  Insofar

as it reflects a valid concern about risks to a discharged jury's impartiality, it fails to

consider that there can be instances when jurors are stopped and recalled before they can

be improperly influenced by contact with other persons or sources of information.  We

---

[5] She also makes a claim of cumulative error.  Finding no error, we need not
address it.

take this opportunity to embrace and expand on the reasoning of *State v. Edwards*,

15 Wn. App. 848, 552 P.2d 1095 (1976), which recognized that a bright line rule is too

severe.

A. *The constitutional right to a verdict authorized by the jury is not implicated when jurors are reempaneled*

Karrlee cites *State v. Williams-Walker*, 167 Wn.2d 889, 896, 225 P.3d 913 (2010)

and *State v. Morales*, 196 Wn. App. 106, 383 P.3d 539 (2016), *review denied*, 187 Wn.2d

1015 (2017), for her argument that the trial court's action violated her constitutional right

to a sentence authorized by a jury. In *Williams-Walker*, jurors in three cases consolidated

for appeal returned special verdicts finding that the defendants committed crimes while

armed with a "deadly weapon." Rather than adding the two years to the defendants'

sentences that was statutorily authorized for a deadly weapon enhancement, however, the

sentencing courts added the five years statutorily authorized for a firearm enhancement—

the aggravator with which each defendant had been charged. While it was implicit in the

*guilty* verdicts that the jury found use of firearms by the defendants, the Supreme Court

declined to hold the guilty verdicts sufficient to authorize the firearm enhancements,

holding instead that "[w]hen the jury is instructed on a specific enhancement and makes

its finding, the sentencing judge is bound by the jury's finding." *Williams-Walker*, 167

Wn.2d at 899.

11

Similarly, in *Morales*, which relies on *Williams-Walker*, the defendant was charged with child molestation in the first degree but the verdict form completed by the jury addressed child molestation in the second degree. The jury had not been instructed on the latter crime. As happened here, there was an error in the verdict form that was not caught when the verdict was returned. A week after the jury was discharged, and in response to a defense motion to set aside the verdict, the trial court corrected the verdict relying on CrR 7.8, convicting the defendant of the greater crime. This court reversed, holding that the defendant's right to a jury-authorized sentence had been violated. In *Morales*, as in *Williams-Walker*, the jury was not reassembled to enter a second verdict that would have authorized the defendant's sentence.

The trial court in this case was aware of the then-recent *Morales* decision, citing it[6] to the lawyers as the reason it was going to recall the jurors:

> Let me give you the benefit of some law, okay? Once a jury is discharged there's a fairly recent case that would provide that the defendant—the Court is without authority to change a verdict form to find a defendant guilty of a count that's not specifically on the verdict form.

RP at 346. The court explained that in some cases a court can make a correction, "[b]ut this is not one of those cases because it has the wrong crime on the verdict form." *Id.* at 346-47.

---

[6] The trial court did not cite it by name, but its discussion of the case took place on February 1, 2017, and the *Morales* decision had been filed a little over four months earlier.

12

The constitutional right to a sentence authorized by the jury applies when the court convicts a defendant based on its correction to the jury's verdict rather than the verdict itself. Because the trial court in this case did not make a correction and based its judgment and sentence on the jury's second set of verdicts, the constitutional right to a sentence authorized by a jury is not implicated.

B.      *Announcing a jury's discharge does not foreclose recall under modern common law*

In *Beglinger*, our Supreme Court held in dicta that a jury cannot be reassembled after being discharged. In that case, a verdict whose effect was to award Mr. Beglinger $5,000 in damages against three defendants, jointly and severally, was read; the jurors were polled, and the court "'advised the jury that seven of their number had completed their jury service and were permanently excused, and advised the remaining five they would report back to the department of the presiding judge on Monday morning.'" *Beglinger*, 164 Wash. at 149. It had not filed the verdict or stated the jurors were discharged, however.

At that point, with the jurors still in the box, it was pointed out by one juror that the verdict in favor of the plaintiff had been intended to be in the total amount of $10,000, with $5,000 payable by three defendants and another $5,000 payable by a fourth. All the other jurors agreed. There was discussion about returning to the jury room to correct the verdict, but the trial court stated that their information "'came too

13

late'" since the jury had been polled and acknowledged the verdict rendered as their verdict. *Id.* Rather than allow the jurors to correct their verdict, the trial court granted a new trial.

On appeal, the Supreme Court stated it had not been too late for the jurors to correct their verdict. "'Until a verdict is received and filed for record, the trial court may send the jury back to consider and clarify or correct mistakes appearing on the face of the verdict.'" *Id.* at 152. It is this holding for which *Beglinger* is most often cited.

The *Beglinger* court went on to opine about the different result that would obtain when a jury is discharged:

> [A]fter a verdict has been received and recorded and the jury discharged, it can no longer function as a jury.
>
> > The power of a jury over their verdict, unlike that of the court, ceases on their discharge. With their assent to the verdict as recorded their functions with respect to the case cease and the trial is closed, and after the verdict is received and the jury discharged the control of the jury is at an end, and they cannot be recalled to alter or amend it. 27 [RULING CASE LAW *Verdict* § 67, at] 895 [(1920)].

*Id.* at 152. The court did not rely for this proposition on any Washington decision, but instead on a treatise on the common law, *Ruling Case Law*, that was published in 1920.

*Beglinger*'s dicta was repeated in *State v. Badda*, 68 Wn.2d 50, 61, 411 P.2d 411 (1966). It was once again dicta; in *Badda*, an error in the verdict form was recognized as soon as the verdict was read, and jurors were directed to resume their deliberations with corrected forms.

14

In *Edwards*, 15 Wn. App. 848, this court qualified (if not rejected) the principle that a jury's power over its verdict ceases with discharge. *Edwards* dealt with a jury's discharge following a declared mistrial. Word was received that the jurors could not agree, and the trial court called them into open court and inquired of the foreman if there was a possibility the jury could reach an agreement within a reasonable time. Upon receiving a negative answer, the court said:

> "The court will declare a mistrial, gentlemen. Mr. Connelly and Mr. Vlosich, I will request that you note the trial of this matter and this cause for retrial immediately, gentlemen."

*Id.* at 848. The jury filed from the court room and into the adjacent jury room where, "within a minute or two thereafter," jurors told the bailiff they had reached a decision on one count. *Id*. at 849. The bailiff notified the court. The trial court put the bailiff under oath, and asked if there was "'any way possibly anybody could have reached that jury?'" *Id*. at 850. The bailiff responded, "'No way.'" *Id*. The trial court called the jurors into the courtroom again, where they returned their verdict on the one count, which the court accepted.

This court affirmed, taking the opportunity to construe "discharged" in RCW 4.44.340[7] as a function of what happens, not what is said:

---

[7] RCW 4.44.340 provides:

In all cases where a jury are discharged or prevented from giving a verdict, by reason of accident or other cause, during the progress of the trial or after the cause is submitted to them, the action shall thereafter be for trial anew.

15

> A discharge will occur in fact when a jury is permitted to pass from the sterility of the court's control and allowed to separate or disperse and mingle with outsiders. In such cases, contamination is presumed even though the jurors may not have taken advantage of the opportunity to discuss the case.
>
> On the other hand, a trial judge's verbal discharge of the jury after receiving its verdict in a criminal case, does not preclude a later correction of the verdict to conform to the actual finding where the jury has not separated or dispersed, but has remained sequestered and insulated from any outside influence and the correction is not one of substance resulting from further deliberation on the merits of the cause. *Cf. Beglinger v. Shield*, 164 Wash. 147, 2 P.2d 681 (1931); *State v. Badda*, 68 Wn.2d 50, 411 P.2d 411 (1966).

*Edwards*, 15 Wn. App. at 850-51 (citations omitted). The court also spoke favorably of

*Commonwealth v. Brown*, 367 Mass. 24, 323 N.E.2d 902 (1975), which involved facts

similar to this case except that it was the jury foreman rather than one of the lawyers who

raised a problem with the verdict moments after it was returned and filed. Even though

the correction in that case was from a verdict of not guilty to a verdict of guilty, the jury

was returned to the courtroom and allowed to correct its verdict. "No more than [four]

minutes elapsed from the time the jury was discharged until they returned to the court."

*Id.* at 851.

A survey of state and federal decisions in *American Law Reports* demonstrates

that the common law of many other jurisdictions prefers reempaneling a jury rather than

requiring a new trial when a problem with a verdict is caught quickly, before any taint of

extraneous influences.

> Although some courts follow the view that a trial court cannot order or permit jurors to revisit the verdict after they have been formally discharged, many courts have considered that a jury's discharge is a function of what has happened, rather than what was said, and have developed a handful of views delineating the circumstances under which a formally discharged jury may be reassembled to take further action.

David J. Marchitelli, Annotation, *Criminal Law: Propriety of Reassembling Jury to Amend, Correct, Clarify, or Otherwise Change Verdict after Jury has been Discharged, or has Reached or Sealed its Verdict and Separated*, 14 A.L.R.5th 89 (1993).

Among the "handful of views" of circumstances under which a jury can be reempaneled is that a court retains jurisdiction to reconvene a jury that has not yet "left the court's control," in the sense of being exposed to outside influences. *Id.* at § 5 (1993 & Supp. 2018); *e.g.*, *People v. Kimbell*, 168 Cal. App. 4th 904, 907, 85 Cal. Rptr. 3d 796 (2008). A similar view is that jurors cannot be reassembled following discharge if they have "separated" in the sense of mingling with nonjurors or being influenced by outside interests. 14 A.L.R.5th, § 6 (1993 & Supp. 2018). An example of this view is *Teixeira v. State*, which holds:

> Until the jury has left the courtroom and dispersed, the judge should be able to allow them to complete their verdict. *Wharton's Criminal Procedure* states:

>> The mere announcement of the discharge of the jurors does not preclude recalling them if they have not yet dispersed and mingled with the bystanders. Although the decisions are not uniform, it has often been held that, when the jurors have rendered their verdict and have been discharged, but have not yet left the courtroom or the courthouse, the trial judge may recall the order of discharge and

17

> reassemble the jurors to amend their verdict as to a matter of form or, in some cases, substance.

213 Md. App. 664, 676, 75 A.3d 371 (2013) (quoting *Hoffert v. State*, 319 Md. 377, 390, 572 A.2d 536 (1990) (Chasanow, J., dissenting) (quoting 4 CHARLES E. TORCIA, WHARTON'S CRIMINAL PROCEDURE § 578, at 141 (12th ed. 1976))).

Other views are that a discharged jury may be recalled after what is only a momentary separation, 14 A.L.R.5th, § 9 at 136-37; *e.g.*, *Webber v. State*, 652 S.W.2d 781, 782 (Tex. Crim. App. 1983) (momentary separation, and it appeared no one had talked to jurors about the case); and that a discharged jury can be reassembled to correct what is an obvious error in form, 14 A.L.R.5th, § 10 at 137-41; *e.g.*, *Serio v. City of Brookhaven*, 208 Miss. 620, 45 So. 2d 257 (1950) (original verdict form contained a textual error corrected in second form).

Finally, a 2016 decision of the United States Supreme Court in *Dietz v. Bouldin*, which recognized the inherent authority of federal courts to rescind a discharge order and recall a jury in a civil case,[8] also recognized and rejected outdated common law.

---

[8] The Supreme Court observed that "[g]iven additional concerns in criminal cases, such as attachment of the double jeopardy bar, we do not address here whether it would be appropriate to recall a jury after discharge in a criminal case." *Dietz v. Bouldin*, ___ U.S. ___, 136 S. Ct. 1885, 1895, 195 L. Ed. 2d 161 (2016). Despite being a civil case, *Dietz* is instructive in rejecting the common law and on the constitutional right to an impartial jury, discussed hereafter.

Refusing a request by the appellant to impose a common law-based categorical bar on

reempaneling a jury after it has been discharged, the Court stated:

> Even assuming that the common-law tradition is as clear as [appellant] contends, the common law is less helpful to understanding modern civil trial practice. At common law, any error in the process of rendering a verdict, no matter how technical or inconsequential, could be remedied only by ordering a new trial. But modern trial practice did away with this system, replacing it with the harmless-error standard now embodied in Rule 61.
> Jury practice itself no longer follows the strictures of the common law. The common law required that juries be sequestered from the rest of society until they reached a verdict. This generally meant no going home at night, no lunch breaks, no dispersing at all until they reached a verdict. Courts are no longer required to impose these requirements on juries in order to prevent possible prejudice. Accordingly, while courts should not think they are generally free to discover new inherent powers that are contrary to civil practice as recognized in the common law, the advent of modern federal trial practice limits the common law's relevance as to the specific question whether a judge can recall a just-discharged jury.

___ U.S. ___, 136 S. Ct. 1885, 1895-96, 195 L. Ed. 2d 161 (2016) (citations omitted).

> C.   *A defendant's right to an impartial jury is the paramount concern in deciding whether to reassemble a discharged jury*

A criminal defendant's right to an impartial jury is guaranteed by article I, section

22 of the Washington Constitution and the Sixth Amendment to the United States

Constitution, which provide equivalent protections. *State v. Munzanreder*, 199 Wn. App.

162, 174, 398 P.3d 1160, *review denied*, 189 Wn.2d 1027, 406 P.3d 280 (2017).

Although *Beglinger* never identified a constitutional concern as a basis for its dicta, an

affidavit of the trial judge describing what had occurred implicitly recognized the

19

importance of the jurors' protection from extraneous influences.[9] *Edwards*, too, focused on whether discharged jurors had the opportunity to "disperse and mingle with outsiders" or had, instead, "remained sequestered and insulated from any outside influence." 15 Wn. App. at 850-51.

The United States Supreme Court in *Dietz*, explaining why the power to rescind a discharge order and recall a dismissed jury "must be carefully circumscribed," identified the "guarantee of an impartial jury that is vital to the fair administration of justice" as the principal concern:

> The potential for taint looms even larger when a jury is reassembled after being discharged. While discharged, jurors are freed from instructions from the court requiring them not to discuss the case with others outside the jury room and to avoid external prejudicial information. . . .
> Any suggestion of prejudice in recalling a discharged jury should counsel a district court not to exercise its inherent power.

---

[9] The affidavit stated, in part:

> [D]uring all of the period of time involved and referred to, there was in the court room, from the time the jury left the jury room, only the presiding judge, the Honorable Malcolm Douglas, his two bailiffs, and the jury and affiant; that at no time did the jury, until finally discharged by the court after the colloquy above mentioned, have an opportunity to mingle with the public or any person or persons at all, in that the court room itself contained no persons at any time from the arrival of affiant until after the jury had left the jury box except those hereinbefore specified, and said jury did not leave the jury box and did not separate after its retirement to deliberate upon its verdict until after all of the above had taken place as herein stated.

*Beglinger*, 164 Wash. at 150-51.

136 S. Ct. at 1893-94 (citations omitted). The Court identified factors relevant to the

constitutional concern that a trial court should consider before reassembling a discharged

jury. The trial court should consider not only any direct evidence of taint, but also the

length of delay between discharge and recall, whether jurors have spoken to anyone about

the case after discharge, whether jurors witnessed an emotional reaction to their verdict,

and whether jurors have accessed their smartphones or the internet. *Id.* at 1894-95.

D.       *Applying these principles to Karrlee's case*

Karrlee's briefing on appeal emphasized that the clerk's minutes indicated "at

least 16 minutes passed between the jury's verdicts and their re-assembly in the

courtroom." Br. of Appellant at 30. That 16 minute time frame was based on minutes

indicating that the court reconvened for the return of the jury's first verdicts at 2:26 p.m.,

and that after the problem with the verdict form was discovered, discussed and the court

decided how to proceed, the jury was brought back into the courtroom at 2:42 p.m.

Based on findings from the reference hearing, we now know that most of the 16 minutes

passed before jurors left the courtroom and after they had been stopped and were waiting

in the hallway for instructions to return.

There were at most several moments between the time jurors in Karrlee's case

were discharged and informed they were being recalled; moments during which jurors

were being escorted to the jury room. The time was so short that neither a cautious court

nor counsel expressed a need to question the jurors about what they had been doing in

21

those few minutes. Neither the bailiff nor the clerk witnessed anything that would taint the jury.

There is overwhelming evidence that the error in the initial second verdict form was overlooked by jurors and that nothing happened that changed their intended verdicts. At the outset of trial, the court read the charges against Karrlee to the jurors; the jurors received proper instructions on both crimes charged; the judge's instructions referred to "both of the crimes," *e.g.*, RP at 306; and the prosecutor talked to jurors in closing argument about the two different crimes and asked jurors to find Karrlee guilty of both. In the first set of verdicts, the jurors completed a special verdict that stated, "We, the jury, having found the defendant guilty of Identity Theft in the First Degree, return a special verdict by answering as follows . . . ." CP at 152. Jurors never questioned the special verdict's reference to them "having found [Karrlee] guilty of Identity Theft in the First Degree." *Id.*

In light of these circumstances, the trial court reasonably rescinded the jury's discharge and allowed it to return corrected verdicts rather than ordering a new trial.

Affirmed.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder having no precedential value shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

22

II.    INEFFECTIVE ASSISTANCE OF COUNSEL

If the trial court properly reempaneled the jury, Karrlee argues that her trial lawyer provided ineffective assistance of counsel by immediately pointing out the problem with the second verdict form. Had he stayed silent and raised the defect later, she argues, the trial court would have been powerless to correct the verdict. Karrlee would have a basis for a new trial.[10]

Effective assistance of counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Mierz*, 127 Wn.2d 460, 471, 901 P.2d 286 (1995). To demonstrate ineffective assistance of counsel, a defendant must show two things: "(1) defense counsel's representation was deficient, *i.e.*, it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, *i.e.*, there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). A claim

---

[10] Alternatively, Karrlee argues that a reasonable attorney would have moved within 10 days for a new trial. We hold that Karrlee had no right to a new trial. Failure to make an unsuccessful argument at an earlier time cannot constitute ineffective assistance of counsel.

23

of ineffective assistance of counsel can be raised for the first time on appeal. *State v. Brown*, 159 Wn. App. 1, 17, 248 P.3d 518 (2010).

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. It is because of the difficulties inherent in making the evaluation that courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" that the defendant must overcome. *Id.*

Every indication is that the lawyers overlooked the flaw in the second verdict form before deliberations, leading to a problem that was unforeseen. We question whether the average reasonable lawyer, faced with this unforeseen problem, would have the command of relevant case law to make the split-second calculation that Karrlee argues should have been made. We need not answer our own question, however, because even if Karrlee's trial lawyer had a command of the relevant case law, he would not have known that Karrlee would lose her right to a new trial if he immediately disclosed the problem to the court. In light of the dicta in *Beglinger* and *Badda*, he might have believed that a decision by the trial court to recall the jurors would be error.

Karrlee fails to overcome the presumption that her trial lawyer's performance was reasonable.

24

III.   CLAIMED EVIDENTIARY ERRORS

A.     *The trial court did not err in admitting business records under RCW 10.96.030(2)*

At the end of the first day of trial, the State announced its intention to offer records of Catherine's Vanguard, American Express and BanCorp accounts the next day, using custodial affidavits as permitted by RCW 10.96.030. When a party has complied with requirements for advance notice and custodial affidavits, chapter 10.96 RCW allows business records to be admitted without the usual live authentication testimony from the record custodian. The statute applies only in criminal cases. It was based on legislative findings, set forth in the statute, that business records needed for criminal prosecution are "often maintain[ed] . . . in a location outside the state of Washington," and that the "ability of law enforcement and the criminal justice system to effectively perform their duties to the public often depends upon . . . being able to obtain and use records relevant to crimes." RCW 10.96.005.

A party seeking to offer records under RCW 10.96.030 must provide "written notice of that intention to all adverse parties, and must make the record and affidavit, declaration, or certification available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them." RCW 10.96.030(3). A motion opposing admission in evidence of the record "shall be made and determined by the court before trial and with sufficient time to allow the party

25

offering the record time, if the motion is granted, to produce the custodian of the record."
*Id.* The failure to "timely file" a motion objecting to the admission of the record
"constitute[s] a waiver of objection to admission of the evidence." RCW 10.96.030(4)[11]
The statute gives the trial court discretion to grant relief from the waiver if the objecting
party shows good cause for its failure to earlier object. *Id.*

Karrlee's counsel admitted that the State sent him an e-mail "several months ago
indicating that they wanted to use RCW 10.96.030" to authenticate documents. RP at 96.
He nonetheless pointed out that the custodians' affidavits fell short of the statute's
requirements, and "[i]t's not our job to get the State's evidence correct" and "not my job
to run out to them and say, 'Hey, fix it.'" RP at 102-03.

The trial court construed the statute as providing that a party opposing admission
of the records waives an objection based on defects in the custodial affidavit by, as the
State had argued, "'laying in the weeds.'" RP at 104. It overruled Karrlee's objection.

On appeal, Karrlee contends that her objection to the records based on the
shortcomings of the custodial affidavits was timely and should have been sustained.

---

[11] Karrlee points out a drafting error in subsection (4) of the statute. The
subsection refers to a "motion under subsection (4)" which, logically, could be referring
only to a motion under subsection (3). Br. of Appellant at 17 n.3. While legitimately
identifying a problem with the statute, even Karrlee recognizes that in this respect,
subsection (4) should not be given a "strict literal reading." *Id.* We agree. We would
provide further analysis if Karrlee relied on subsection (4)'s self-reference, which she
does not.

Generally, we review a trial court's decision of whether evidence is admissible for abuse of discretion. *State v. Dow*, 168 Wn.2d 243, 248-49, 227 P.3d 1278 (2010). But determining the meaning of RCW 10.96.030 presents a question of law. The application of law is reviewed de novo. *Id.* (citing *State v. Law*, 110 Wn. App. 36, 39, 38 P.3d 374 (2002)).

Karrlee relies on subsection (2) of the statute and especially on language she highlights:

> "**To be admissible** without testimony from the custodian of records, **business records must be accompanied by** an affidavit, declaration, or certification by its record custodian or other qualified person that includes contact information for the witness completing the document and attests to the following:
>
> (a) The witness is the custodian of the record or sets forth evidence that the witness is qualified to testify about the record;
> (b) The record was made at or near the time of the act, condition, or event set forth in the record by, or from information transmitted by, a person with knowledge of those matters;
> (c) The record was made in the regular course of business;
> (d) The identity of the record and the mode of its preparation; and
> (e) Either that the record is the original or that it is a duplicate that accurately reproduces the original."

Br. of Appellant at 9 (quoting RCW 10.96.030(2)). She argues that the required content of the affidavit, declaration, or certificate is clear.

We agree. But the statute also provides, as the trial court recognized, that a basis for objection can be waived. We do not determine a statute's plain meaning by looking at one of its subsections in isolation; rather, we assess its plain meaning by "viewing the

27

words of a particular provision in the context of the statute in which they are found, together with related statutory provisions, and the statutory scheme as a whole." *Burns v. City of Seattle*, 161 Wn.2d 129, 140, 164 P.3d 475 (2007) (citing *Dep't of Ecology v. Campbell & Gwinn*, *LLC*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002)). To say that the failure of a party to file a motion "shall constitute a waiver of objection to admission of the evidence" has a meaning that is clear. "[T]he evidence" is the custodially-authenticated record. By failing to file a motion, Karrlee waived any objections to admission of the financial records.

Karrlee argues that RCW 10.96.030(3) authorizes a motion to object to admission in evidence of a *record*, but not a motion to object to admission of a *custodial affidavit, declaration, or certification*. *See* Br. of Appellant at 17-18. We don't disagree, but the State never needed the court to admit the custodial affidavits. While they likely were filed with the court or marked as an exhibit to ensure their inclusion in the record, they did not have to be admitted or admissible. *See* ER 104(a) ("Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court . . . . In making its determination it is not bound by the Rules of Evidence except those with respect to privileges.").

Karrlee also argues that the analysis of the Supreme Court in *State v. Neal*, 144 Wn.2d 600, 30 P.3d 1255 (2001) supports her construction of RCW 10.96.030. *Neal* construed CrR 6.13(b), which, like RCW 10.96.030, identifies the required content of a

certification that can support the admission of a written report without further proof or foundation. But CrR 6.13(b) has no waiver provision. *Neal* reasoned that if a certification of a report meets CrR 6.13(b)'s requirements, then ER 802's rule of hearsay's inadmissibility[12] does not apply to the report; if the certification does *not* meet the requirements, then ER 802's rule of inadmissibility *does* apply. *Neal*, 144 Wn.2d at 609-10. ER 802's rule of inadmissibility is not a problem for the State in this case, because by failing to file a timely motion, Karrlee waived any objection to the financial records based on ER 802.

"'Ultimately, in resolving a question of statutory construction, . . . court[s] will adopt the interpretation which best advances the legislative purpose.'" *Citizens All. for Prop. Rights Legal Fund v. San Juan County*, 184 Wn.2d 428, 437, 359 P.3d 753 (2015) (quoting *Bennett v. Hardy*, 113 Wn.2d 912, 928, 784 P.2d 1258 (1990)). There is a clear legislative purpose in requiring that a party's notice of intent to rely on RCW 10.96.030 and a motion opposing admission of the proposed record each take place sufficiently in advance of trial that the party offering the record has time, if the opposition is sustained, to produce a custodian. The clear purpose is to flush out objections that could be cured in some manner if disclosed, including by bringing a custodian to trial. Karrlee's construction would frustrate this legislative purpose.

---

[12] "Hearsay is not admissible except as provided by these rules, by other court rules, or by statute." ER 802.

Read as a whole, RCW 10.96.030 has a meaning that is clear. The trial court correctly construed it in ruling on Karrlee's objection.

> B. *Karrlee's objection to the manner in which the State addressed information volunteered by Catherine during trial was not preserved*

Karrlee filed motions in limine, one of which asked that the court require her mother "to refrain from making statements beyond the scope of examination." CP at 14. Defense counsel explained to the court that the reason for that particular motion was that when he interviewed Catherine before trial,

> at some points it was very off topic, that got into things that are completely irrelevant to this case, and I just want to make sure the State knows I'll be jumpin' up and down and let's avoid potential mistrial issues if we can.

RP at 10. The prosecutor responded by informing the court that given the relationship between Catherine and Karrlee, there could be a "slew of back and forth allegations" if the court allowed it, "which I'm sure the Court won't." RP at 11. He stated that he and family members had warned Catherine to "try to listen to the question and answer the question only. I don't know what more we can really do." RP at 10. While the court granted Karrlee's other motions in limine, it reserved ruling on this motion, requiring Karrlee to object if the problem arose at trial.

Catherine's propensity to volunteer manifested itself during direct examination, when the State asked her about a Visa credit card she had in the past, and she began to go off topic before being stopped by the prosecutor:

30

> A. . . . and in 2010 I found out I had a balance of $10,000.00 on it, and I hadn't been usin' it, and when I got the printout I saw all the printouts of, at that time, my daughter and her—
> Q. Let me hold—let me stop you right there.
> All I asked, just for now, was just what sort of credit card you had.

RP at 224. Defense counsel did not object.

During an afternoon recess, with Catherine still on the stand, the prosecutor—not defense counsel—explained that what Catherine had been about to get into was the fact that Karrlee's ex-husband, Rocco Morris, had run up the $10,000 on Catherine's Visa card. He told the court he would like to establish that thereafter, Catherine had warned her daughter and was extremely careful with her use of credit cards. The trial court disclosed that its impression from Catherine's testimony was that Karrlee may have run up the $10,000. It then ruled:

> THE COURT: Okay. I think 404(b) would be violated if you were to have testimony that associated this defendant with the Rocco Morris' misuse of the card.
> . . . .
> . . . That would not be appropriate, but *I do think it would be appropriate to correct the impression that the jury may have that the defendant is the one who misused that card and ran up the $10,000.00.* If you want to argue that that made Catherine Clements more careful, I don't see a problem with that so long as you don't, again, associate the defendant with the misappropriation that apparently occurred several years ago.
> Any objection to that, [Defense Counsel]?
> [DEFENSE COUNSEL]: No.

RP at 231 (emphasis added).

31

Acting on the court's directive, the State later clarified with Catherine that it was Rocco who used the Visa credit card, asking, "Anyway, you mentioned something about him, Rocco, putting or accessing credit cards and running up like $10,000.00 in debt[?]" RP at 241. Catherine explained that she had taken out one credit card, which Rocco had maxed out, and when he was arrested "the police found credit cards in my name in his wallet." RP at 242. The State clarified, "Rocco was the one that was actually charged?" RP at 242. Catherine confirmed that Rocco was charged, and her daughter was not. Defense counsel did not object.

Karrlee now argues for the first time that "[t]his was hardly clearing up the misimpression the court expressed concern about, and violated the court's ruling to make no further association between Karrlee and the incident." Br. of Appellant at 23. She argues that the court's ruling was in error or an abuse of discretion. Error, if any, was not preserved. *See* RAP 2.5(a).

IV.   CLAIMED INSTRUCTIONAL ERRORS

Before closing argument, the trial court asked the lawyers to provide formal exceptions and objections to the court's jury instructions. Defense counsel answered, "We have none." RP at 295. For the first time on appeal, Karrlee argues that the jury instructions on the theft charge defined only "deception," not "by color or aid of deception," and that the version of the pattern "to-convict" instruction for identity theft failed to accurately state the knowledge element. Karrlee characterizes both challenges

32

as involving omission of an essential element, and therefore manifest constitutional error that she can raise for the first time on appeal. *See* RAP 2.5(a)(3).

A. *Failure to define "by color or aid of deception"*

Karrlee argues that the trial court's instructions omitted an essential element of theft by deception: reliance.

In *State v. Casey*, 81 Wn. App. 524, 528, 915 P.2d 587 (1996), this court concluded that reliance, which was an essential element of the former crime of larceny by false pretenses, continues to be an essential element of the crime of theft by deception. The State argued in *Casey* that the legislature removed reliance as an element when it enacted the theft statute, which does not explicitly require reliance.[13] This court disagreed, pointing out that the legislature preserved the "*operative language* 'by color or aid of'" deception. *Id.* (emphasis added). It stated that "substitution of the term 'deception' for 'false pretenses' merely indicates an intent to broaden the scope of the statute to include more kinds of devious behavior." *Id.*

It has been over 20 years since *Casey* was decided, and the Washington pattern to-convict instruction for theft in the first degree still does not include the word "reliance" as a required element of theft by deception. *See* 11A WASHINGTON PRACTICE:

---

[13] RCW 9A.56.020(1)(b) includes, as a means of committing first degree theft, "By color or aid of deception to obtain control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services."

WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 70.02, at 46 (4th ed. 2016) (WPIC). The Washington Pattern Jury Instruction Committee continues to state the essential element of reliance in what is considered the equivalent language from the theft statute: "by color or aid of deception." *Id.*; RCW 9A.56.020(1)(b). The trial court's to-convict instruction for theft in the first degree, its jury instruction 7, was based on WPIC 70.02 and required the jury to find the essential element of obtaining control over property of another "by color or aid of deception." CP at 134.

Karrlee argues that the court should have provided jurors with an instruction defining "by color or aid of deception." A pattern instruction, WPIC 79.03, defines the expression and Karrlee could have requested that it be given, but she did not. As earlier noted, she did not object when the pattern instruction defining "deception" (WPIC 79.04) was given instead. A failure to define a term is not manifest constitutional error. *State v. O'Hara*, 167 Wn.2d 91, 100-01, 217 P.3d 756 (2009). Argument that it would have been better to define "by color or aid of deception" was not preserved.

B.      *Failure to use the current version of WPIC 131.02*

Karrlee's second claim of instructional error is that the trial court's to-convict instruction for identity theft failed to include an essential knowledge element recognized in *State v. Zeferino-Lopez*, 179 Wn. App. 592, 319 P.3d 94 (2014). In that case, involving an immigrant who bought a Social Security card for $100 so he could get work, the State successfully argued to the trial court that while it was required by RCW

34

9.35.020(1) to prove the defendant knowingly obtained, possessed, or used the Social Security card, it was not required to prove that the defendant knew the number on the card belonged to another person. *Zeferino-Lopez*, 179 Wn. App. at 595. The statute provides, "No person may knowingly obtain, possess, use, or transfer a means of identification or financial information of another person, living or dead, with the intent to commit, or to aid or abet, any crime." *Id.* at 596.

This court disagreed, holding that "'as a matter of ordinary English grammar,' the adverb 'knowingly' applies to both the verbs and the object of the sentence." *Id.* at 598 (quoting *Flores-Figueroa v. United States*, 556 U.S. 646, 650, 657, 129 S. Ct. 1886, 173 L. Ed. 2d 853 (2009)). Following *Zeferino-Lopez*, the pattern to-convict instruction for identity theft was modified by the addition of a requirement that the following be proved beyond a reasonable doubt: "(3) That the defendant knew that the means of identification or financial information belonged to another person." WPIC 131.02.

The to-convict instruction given in Karrlee's case was a pre-December 2015 version of WPIC 131.02 and addressed the knowledge element as being that Karrlee "knowingly obtained, possessed, or used a means of identification or financial information of another person." CP at 135 (Jury Instruction 8). Again, Karrlee did not object to the instruction. She now argues that it is deficient without the modification made to WPIC 131.02 in 2015.

35

Her argument overlooks the fact that the instruction given tracks the language of RCW 9.35.020(1) and is the very language that this court held in *Zeferino-Lopez* "as a matter of ordinary English grammar" conveys knowledge of both the actions and the object. The modification of the WPIC is more fairly characterized as a clarification than a correction. The court in *Zeferino-Lopez* did not find fault with the jury instruction; it found fault with the prosecutor's argument about what the instruction required the State to prove.

In any event, if the instruction was erroneous, the error was harmless under even constitutional harmless error analysis. Karrlee consistently testified that she knew the 401(k) account belonged to her mother.

V.    CLAIMED SENTENCING ERRORS

Karrlee argues the trial court erred when it calculated her offender score by counting her two convictions separately. Because of the likelihood that the length of an exceptional sentence is based in part on what the standard range would have been, she argues that remand for resentencing is required. She also argues that the sentence was based on untenable grounds and was clearly excessive.

*A.    Miscalculated offender score*

Karrlee argues that the trial court erred by failing to treat her two crimes as the same criminal conduct in calculating her offender score. Her trial lawyer did not contend that her crimes constituted the same criminal conduct at sentencing.

36

A trial court calculates a defendant's offender score for sentencing purposes by counting current offenses and past convictions. RCW 9.94A.589(1)(a). The offender score for a given current offense includes all other current offenses unless the trial court finds "that some or all of the current offenses encompass the same criminal conduct." *Id.* In that event, those current offenses are counted as one crime in arriving at the offender score. Offenses constitute the same criminal conduct if they "require the same criminal intent, are committed at the same time and place, and involve the same victim." *Id.* All three criteria must be present. *State v. Lessley*, 118 Wn.2d 773, 778, 827 P.2d 996 (1992).

"Deciding whether crimes involve the same time, place, and victim often involves determinations of fact," and it is well settled that "a court's determination of same criminal conduct will not be disturbed unless the sentencing court abuses its discretion or misapplies the law." *State v. Chenoweth*, 185 Wn.2d 218, 220-21, 370 P.3d 6 (2016). Here, the State identifies an issue of fact as to whether there were two victims of the theft count: Catherine and Vanguard. The parties agree that Catherine was the only victim of identity theft.

Karrlee complains that this factual dispute is being raised for the first time on appeal. But if the identity of additional victims was not raised below, it is because Karrlee did not argue same criminal conduct at sentencing. For purposes of Karrlee's

prosecution, the State had no burden to prove that anyone other than Catherine was a victim.

For sentencing issues that involve discretion, a failure to raise the issue in the trial court operates as a waiver. *In re Pers. Restraint of Goodwin*, 146 Wn.2d 861, 874, 50 P.3d 618 (2002). A sentencing court is not required to undertake a same criminal conduct analysis sua sponte. *State v. Nitsch*, 100 Wn. App. 512, 524-25, 997 P.2d 1000 (2000). We will not entertain Karrlee's unpreserved challenge to the trial court's calculation of her offender score.

> B. *Challenge to exceptional sentence as based on untenable grounds and clearly excessive*

Finally, Karrlee argues that sentencing her to one month incarceration for every $10,000 she stole was an untenable basis for imposing a 20-month sentence. While the State suggested a $10,000 per month approach to arriving at the length of an exceptional sentence, the trial court's written findings of fact and conclusions of law provide different reasons for the sentence it imposed: the standard range sentence, which Karrlee did not dispute; the jury's justified finding that the offenses were major economic offenses; the monetary loss was substantial; the crimes involved a high degree of sophistication and planning; and the scheme occurred over a long period of time. All are tenable reasons for the sentence.

Nor is the sentence excessive, given these circumstances. Its length, in light of the record, does not "shock the conscience." *State v. Knutz*, 161 Wn. App. 395, 411, 253 P.3d 437 (2011).

*Costs on review.* Ms. Clements has moved the panel to deny an award of costs should the State substantially prevail on review, which it has.[14] In a report as to continued indigency, she demonstrates substantial liabilities including the restitution ordered in this case, which is a priority. We deny an award of costs on review.

Affirmed.

_____
Siddoway, J.

WE CONCUR:

_____
Fearing, J.

_____
Pennell, A.C.J.

---

[14] Ms. Clements also challenges this division's general order, *In re the Matter of Court Administration Order re: Request to Deny Cost Award* (Wash. Ct. App. June 10, 2016), as inconsistent with RAP 14.2. There is no inconsistency; our general order merely creates a second opportunity for an appellant to avoid an award of costs by demonstrating indigency. It identifies the information the panel will require if it is asked to deny costs in its opinion. *See* https://www.courts.wa.gov/appellate_trial_courts /?fa=atc.genorders&div=III.